UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

BRIAN SAKACSI, on behalf of himself
and others similarly situated

    Plaintiff,

v.

                                                  Case No.  8:06-cv-1297-T-24-MAP

QUICKSILVER DELIVERY SYSTEMS,
INC. d/b/a Q.D.S. Logistics, a Florida
corporation, and MICHAEL A. BAKER,

    Defendants.
_____/

## ORDER

This cause comes before the Court on Plaintiffs' Motion for Summary Judgment.  (Doc. No. 54.)  Defendants Quicksilver Delivery Systems, Inc. d/b/a Q.D.S. Logistics ("QDS") and Michael A. Baker ("Baker") (jointly, "Defendants") oppose this motion.[1]  (Doc. No. 72.)  Plaintiffs Brian Sakacsi ("Sakacsi") and all others similarly situated (collectively, "Plaintiffs") bring the instant action against Defendants, seeking recovery of overtime compensation under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*  Defendants' second affirmative defense asserts that Plaintiffs were independent contractors rather than employees, and therefore, Plaintiffs are not entitled to overtime compensation under the FLSA.  Plaintiffs have moved for summary judgment on this affirmative defense.

---

[1] While Defendant Baker is now named as a defendant in this case, Plaintiffs did not add this party until they filed a First Amended Complaint on July 16, 2007.  (Doc. No. 58.)  Because the instant motion for summary judgment was filed before Plaintiffs' First Amended Complaint, the Court only considers its merits as to the dispute between Plaintiffs and Defendant QDS.

**I.     Facts and Procedural History**

Defendant Baker is the Vice-President and Chief Executive Officer of QDS, a courier delivery company that provides delivery services for institutional pharmacies. (Baker Depo. at 11, 14.) Essentially, QDS collects prescription pharmaceuticals from the institutional pharmacies and delivers them to various nursing homes, assisted living facilities, and skilled nursing facilities. (*Id.* at 11.) QDS maintains its corporate office in Largo, Florida, and presently has outstanding contracts with pharmacies in both Florida and Alabama. (*Id.* at 15.)

To fulfill its delivery obligations, QDS relies on a fleet of drivers and several account managers—approximately sixty to seventy individuals in total. (*Id.* at 38.) One account manager is assigned to each of the pharmacies with which QDS has an outstanding contract. (*Id.* at 63.) Each of the account managers report directly to Baker. (*Id.*) Among other things, account managers are responsible for ensuring that the drivers show up for deliveries, for helping drivers with any problems that arise, and for providing the drivers with their daily route sheets. (*Id.* 36-37.) The daily route sheets list the driver's destinations and the estimated delivery time for each destination. (*Id.* at Ex. 17.) QDS composes each driver's route sheet according to the pharmacy's requests. (Baker Depo. at 33-34.) Drivers can, and occasionally do, deviate from the delivery schedule set forth in their daily route sheets, but QDS instructs its drivers to notify an account manager before doing so, so that QDS may get approval for the change from the affected pharmacy.[2] (*Id.* at 34-35.)

Upon being hired, all drivers and account managers sign an "Independent Contractor

---

[2]Drivers are also instructed to call an account manager if they anticipate being late for a pick-up or delivery. (Baker Depo. at 125.) If a driver anticipates being more than an hour late, a new driver will be found to run the route. (*Id.*)

2

Agreement."[3] (*Id.* at Ex. 2.) The agreement provides that drivers must provide their own vehicles and will be paid on a per job basis. (*Id.*) While the agreement permits drivers to seek employment outside of and in addition to the deliveries performed for QDS, it also contains a "Non-Solicitation Covenant" that prohibits drivers, for a period of two years following the termination of the agreement, from "directly or indirectly solicit[ing] business from, or attempt[ing] to sell, license, or provide the same or similar products or services as are provided" by QDS to any of QDS' clients or potential clients. (*Id.*)

In practice, drivers pay for their own travel costs, including gas and insurance, and provide their own vehicles.[4] (*Id.* at 39.) The drivers' compensation is calculated according to a percentage rate established by Baker, and fluctuates depending on the profit Baker seeks for QDS. (*Id.* at 119-120.) Drivers are required to complete and submit weekly "Drivers Log" sheets documenting their work. (*Id.* at 25-26.) The Drivers Log sheets keep track of which deliveries the drivers complete and how long they spend on routes. (*Id.*) Baker uses the Drivers Log sheets to calculate, based on the established percentage rate, each driver's compensation for a given pay period (on a bi-weekly basis). (*Id.* at 26.)

QDS account managers make the hiring decisions for new drivers (*id.* at 78), but a driver cannot be employed until he or she signs a variety of documents, including a consent to be drug tested (*id.* at Ex. 7), a drug screen form (*id.* at Ex. 8), a notice that an occupational license or a

---

[3]Because only delivery drivers are included in the collective class of Plaintiffs, the question of whether QDS account managers are independent contractors or employees is not currently before the Court. (*See* Doc. Nos. 16, 19.)

[4]Additionally, QDS policy had changed within the past six months, and drivers are now also required to furnish their own cell phones with Bluetooth technology. (Baker Depo. at 50.)

tax identification number is required within ten days of employment (*id.* at Ex. 6), and a variety of other forms, including the Independent Contractor Agreement (*id.* at 93-98, Ex. 2). Account managers usually train new drivers.[5] (*Id.* at 84-85.) The training process varies according to each new driver's learning ability, but usually takes only a matter of hours. (*Id.* at 48-49, 86-87.) Drivers are compensated on an hourly basis for time spent training. (*Id.* at 86.) Account managers sometimes provide new drivers with a QDS "Drivers Guide." (*Id.* at 85-86, Ex. 3.) Account managers are also charged with acting as disciplinarians should there be problems with the drivers, including but not limited to: tardiness, delivery mistakes, unkempt appearance, or failure to appear for work in QDS uniforms or without identification badges. (*Id.* at 126-128, 130-131; Culver Depo. at 24-33.)

Plaintiff Sakacsi worked as a driver for QDS from February 19, 2003 until June 22, 2006. On July 13, 2006, Sakacsi filed a complaint against QDS seeking recovery of unpaid overtime compensation under the FLSA, on behalf of himself and others similarly situated. (Doc. No. 1.) On November 1, 2006, Plaintiffs and QDS filed a Joint Stipulation for Conditional Certification of Collective Action, agreeing that the collective class in this action should consist of "[a]ll current and former delivery drivers who worked for Defendant for at least forty-five (45) days during any time between October 15, 2004 and the present." (Doc. No. 16.) On November 9, 2006, the Court granted the Joint Stipulation for Conditional Certification of Collective Action. (Doc. No. 19.) Plaintiffs filed the instant motion for summary judgment on July 13, 2007, and Defendants filed their response in opposition on August 9, 2007.

---

[5]But, if the driver is being hired to work on a new contract, Baker will typically conduct a mass training for all new drivers and account managers. (Baker Depo. at 84.)

**II.     Standard of Review**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must draw all inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor. See Porter v. Ray, 461 F.3d 1315, 1320 (11th Cir. 2006)(citation omitted). The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. See id. (citation omitted). When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. See id. (citation omitted).

**III.    Analysis**

Plaintiffs assert that they were "employees" under § 203 of the FLSA, and therefore, they are entitled to judgment as a matter of law against Defendants' affirmative defense asserting that Plaintiffs were independent contractors not entitled to the guarantees of the FLSA. The Defendants counter that there are issues of material fact as to whether Plaintiffs were independent contractors.

Under the FLSA, employers generally must pay employees who work more than forty hours a week at a rate not less than "time and a half" their regular rate of pay for all hours worked in excess of the first forty. 29 U.S.C. § 207(a)(1). It has long been recognized that "there is in the Fair Labor Standards Act no definition that solves problems as to the limits of the

employer-employee relationship under the Act." *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 728 (1947). Thus, defining the contours of the employer-employee relationship within the meaning of the FLSA has been left to the courts.

The term "employ" is defined by the FLSA with "striking breadth" to mean "suffer or permit to work." *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992); 29 U.S.C. § 203(g). This interpretation has been identified as "the broadest definition [of employee] that has ever been included in one act." *Antenor v. D & S Farms*, 88 F.3d 925, 929 n. 5 (11th Cir. 1996) (quoting *United States v. Rosenwasser*, 323 U.S. 360, 363 n. 3 (1945)). When examining whether there is an employment relationship, "the label the parties put on the relationship is not determinative, nor is it relevant whether the parties intended to create an employment relationship." *Molina v. S. Fla. Express Bankserv, Inc.*, 420 F. Supp. 2d 1276, 1283 (M.D. Fla. 2006) (citing *Rutherford Food*, 331 U.S. at 729). Instead, courts examine "the 'economic reality' of whether the putative employee is economically dependent upon the alleged employer." *Harrell v. Diamond A Entertainment, Inc.*, 992 F. Supp. 1343, 1348 (M.D. Fla. 1997) (citing *Rutherford Food*, 331 U.S. at 730; *Aimable v. Long & Scott Farms*, 20 F.3d 434, 439 (11th Cir. 1994)).

> The economic dependency analysis involves six factors which serve as guideposts:
>
> (i) the degree of control exercised by the alleged employer, (ii) the relative investments of the alleged employer and employee, (iii) the degree to which the employee's opportunity for profit and loss is determined by the employer, (iv) the skill and initiative required in performing the job, (v) the permanency of the relationship, and (vi) the degree to which the alleged employee's tasks are integral to the employer's business.

*Harrell*, 992 F. Supp. at 1348 (citing *Real v. Driscoll Strawberry Associates, Inc.*, 603 F.2d 748, 754 (9th Cir. 1979)); *see also Molina*, 420 F. Supp. 2d at 1283–84 (articulating similar factors)

(citing *Herman v. Express Sixty-Minutes Delivery Serv., Inc.*, 161 F.3d 299, 303 (5th Cir. 1998); *Donovan v. Tehco, Inc.*, 642 F.2d 141, 143 (5th Cir. 1981); *Usery v. Pilgrim Equip. Co., Inc.*, 527 F.2d 1308, 1312 (5th Cir. 1976)). These factors are helpful to the economic dependency inquiry, but no one factor is controlling, and "the weight of each factor depends on the light it sheds on the . . . economic dependence (or lack thereof) on the alleged employer, which in turn depends on the facts of the case." *Antenor*, 88 F.3d at 932–33. The Court will examine each factor separately.

### A. Degree of Control

As to the degree of control exercised by the alleged employer, Defendants contend that QDS has minimal control over its drivers. (Doc. No. 72 at 13-14.) Defendants attempt to portray the delivery system established by QDS as one in which the drivers accept whatever deliveries they wish, whenever they wish, and make deliveries according to their own agenda, rejecting QDS-provided routes and schedules without repercussion. (*Id.*) Conversely, Plaintiffs argue that QDS exercises a great deal of control over the manner in which drivers complete their tasks, and greatly limit the drivers' autonomy. (Doc. No. 54 at 14–17.)

"Control is only significant when it shows an individual exerts such a control over a meaningful part of the business that she stands as a separate economic entity." *Molina*, 420 F. Supp. 2d at 1285 (quoting *Usery*, 527 F.2d at 1312–13). At the same time, the way in which the parties could have behaved under the contract terms is irrelevant; instead, it is the way in which the parties actually acted that is controlling when conducting an economic realities analysis. *Id.* at 1284 n. 25 (citing *Halferty v. Pulse Drug Co., Inc.*, 821 F.2d 261, 266 (5th Cir. 1987); *Usery*, 527 F.2d at 1312).

Plaintiffs list a number of facts suggesting both that the level of control exercised by QDS over its drivers was great, and that the drivers had very little control over the manner in which they functioned. Plaintiffs argue that this comparative examination suggests an employment relationship. For instance, through its account managers, QDS places drivers in specific routes when routes become available, either by hiring new drivers (Baker Depo. at 78), or by allowing lateral movement among established drivers, pursuant to a seniority system in which the most tenured drivers are given preference (*id.* at 72-73). QDS account managers provide basic training for drivers so that, according to Baker, "they can have an idea what they're doing," including how to fill out required QDS paperwork and use the QDS-issued iPAQ devices.[6] In some instances, new drivers are provided with a QDS Driver's Manual, which articulates various requirements and acceptable practices. Furthermore, QDS account managers provide the drivers with daily route sheets establishing the order in which deliveries should be completed and the estimated delivery time of each delivery. QDS requires its drivers to contact an account manager before varying from a daily route sheet's schedule of deliveries, so that the account manager can pre-approve any changes. To that end, a driver who is more than an hour late for a pick-up will lose that route for the day.

Additionally, drivers are required to wear uniforms bearing the QDS emblem (*id*. at 98-101), must wear badges identifying them as QDS drivers (*id.* at Ex. 4), and are told to maintain a neat appearance (*id.* at 100). Drivers are subjected to various other restrictions, including a prohibition on outsiders accompanying drivers as helpers or passengers (*id.* at 141-142, Ex. 18),

---

[6] The iPAQ devices are used to scan the prescription deliveries into a QDS-operated computer system that keeps track of all deliveries.

and a prohibition on subcontracting their work (*id.* at 143).  Also, the Independent Contractor Agreement contains a Non-Solicitation Covenant which prohibits drivers from competing with QDS for a period of two years after the end of a driver's relationship with the company. Meanwhile, drivers are subject to disciplinary action by the account managers, ranging from the issuance of warnings to termination of the driver's contract with QDS, depending on the severity and repeat-nature of the offense.  (Culver Depo. at 24:13–33:3.)

Defendants respond that the degree of control factor in the instant case is factually similar to the consolidated cases of *United States v. Silk* and *Harrison v. Greyvan Lines, Inc.*, 331 U.S. 704 (1947), where the Supreme Court concluded there were independent contractor relationships. However, both cases are inapposite to the instant case, because here the Court is addressing whether the drivers were independent contractors or employees under the FLSA, and in both *Silk* and *Greyvan* the Supreme Court was addressing whether the persons involved were independent contractors or employees under the Social Security Act.  Additionally, the standard used by the Supreme Court in *Silk* and *Greyvan* was subsequently rejected by the Supreme Court.[7]  This Court finds that Defendants' reliance on these cases is misplaced.

Defendants attempt to minimize the evidence of QDS' control over the drivers by arguing that many QDS policies, practices, and requirements referenced by Plaintiffs are attributable to the pharmacies' requirements.  For example: (1) the prohibition on passengers and helpers is a reflection of the pharmacies' concerns regarding the safety and security of the prescription drugs

---

[7]In *Daughtrey v. Honeywell, Inc.*, the 11th Circuit noted that the directive announced in *Silk* and *Greyvan*, that the scope of "employee" should depend upon the statutory purpose, was rejected by the Supreme Court *Nationwide Mutual Insurance Co. v. Darden*, 503 U.S. 318 (1992).   3 F.3d 1488, 1496 n. 16 (11th Cir. 1993).

being delivered; (2) the daily route sheets are established according to the needs and demands of the pharmacies; (3) drivers who are more than an hour late for a pick-up lose the job because of the sensitive nature of the medications being delivered; (4) uniforms and cleanliness are a professional courtesy for the pharmacies and nursing homes served; and (5) drivers are required to contact account managers before altering a route so the account managers can in turn get approval from the pharmacies.  Defendants contend that these facts should be attributed to the pharmacies, and not QDS.

The Court finds this argument unpersuasive in light of the fact that "[a]ny employer's business is, in essence, dictated by the needs of its customers." *Molina*, 420 F. Supp. 2d at 1284 n. 24.  That QDS' customers are pharmacies with their own unique needs matters not.  The key inquiry, rather, is how QDS goes about meeting the pharmacies' needs, and to what extent the chosen methods operate to control the activities of QDS drivers and in turn restrict their autonomy.

Defendants also argue that the drivers' independence and control is evidenced by the fact that nothing prohibited drivers from working for QDS competitors.  However, the economic realities inquiry does not concern itself with what parties could theoretically do, but rather with how parties actually behave.  *Id.* at 1284 n. 25.  Defendants have provided no evidence that any QDS drivers have ever actually worked for QDS' competitors.[8]

---

[8] During his deposition, when asked whether he was aware of any drivers who worked for competitors while working for QDS, Michael Walker, a QDS driver and account manager, answered in the negative, offering only instances in which drivers provided delivery services for companies who served non-pharmacy customers.  (Walker Depo. at 40:1–6.)  Michael White, who also worked as a QDS account manager and driver, also answered negatively when asked a similar question.  (White Depo. at 100:5–8.)

There is some evidence, however, suggesting that the drivers had a small degree of control over the manner in which they functioned. Drivers are free to reject work at any time without ramification, and may swap or exchange routes with other drivers. (Walker Depo. at 19-20, 78-80.) Additionally, drivers may terminate the Independent Contractor Agreement at will, with or without notice. (Baker Depo. at Ex. 2.) The Court also notes that there were a few examples of drivers who altered their delivery routes, although it is unclear whether they received advance approval for these alterations as required. (*Id.* at 31.)

An independent contractor relationship exists only if the control exerted by the drivers was so meaningful that they ultimately stood as separate economic entities. *See Molina*, 420 F. Supp. 2d at 1285 (citing *Usery*, 527 F.2d at 1312–13); *see also Harrell*, 992 F. Supp. at 1349 (articulating the rule in the context of a relationship between an exotic dancer and a nightclub owner). The Court finds that the parcels of control exercised by the drivers pale in comparison to the many and varying ways in which QDS controls the behavior, actions, appearance, and schedule of its drivers, such that it cannot be said that the drivers stood as a separate economic entity from QDS. This factor weighs in favor of finding an employment relationship.

### B. Relative Investments of the Parties

Defendants argue that because drivers are responsible for providing their own cars, gas, maintenance, and automobile insurance, the relative investments factor cuts in their favor, suggesting independent contractor status. However, there is no evidence that any drivers either purchased or used an automobile exclusively for delivery purposes. In fact, most drivers used their own personal cars to make QDS deliveries. (Baker Depo. at 62.) Additionally, "because a car is an essential vehicle in most households," the drivers' investment of providing their own

cars, gas, maintenance, and automobile insurance is not entirely persuasive. *Molina*, 420 F. Supp. 2d at 1285 (citing *Herman*, 161 F.3d at 304 (stating that investment in a vehicle is "somewhat diluted when one considers that the vehicle is also used by most drivers for personal purposes")).

With regard to Defendant QDS' relative investments, Plaintiffs point out that QDS provides all drivers with iPAQ devices or Nextel telephones free of charge, and pays for all necessary upkeep and repairs to the units, so that all deliveries can be scanned into a QDS-operated computer system. (Baker Depo. at 51.) The cost of purchasing the software necessary for using the iPAQ system totaled about $165,000.00, the servers used to run the iPAQ system totaled about $560,000.00, and the iPAQs themselves totaled about $200,000.00. (*Id.* at 56-57.) Additionally, QDS maintains an office in Largo, Florida, though the record does not show what costs are involved with owning or leasing this office. QDS also provides all of its account managers with a copier, printer, and fax machine. (*Id.* at 64.) Finally, QDS is responsible for paying all of its drivers and account managers, although here too the record does not show what these expenditures total.

Defendants argue that the cost of iPAQs and all necessary computer servers and software should not be considered when examining QDS' relative investments. In essence, they contend that the resources QDS invested in technological equipment is irrelevant because it is the delivery of the prescription drugs that is central to QDS' business, and since the drivers are the primary investors in regard to the delivery aspect, their investment outweighs that of QDS. The Court is not persuaded. As technology advances the marketplace, most businesses must substantially invest in technology in order to stay competitive. If QDS were not to do so, it

12

would no doubt risk losing pharmacy contracts to competitors who are equipt with modern technologies. QDS' investment in technological equipment should not be discounted.

Taking all of the aforementioned facts into consideration, the Court finds that the relative investment of QDS far outweighs that of its drivers, particularly when one considers the importance of the drivers' main investment—their automobiles—is diluted by the fact that most use their personal vehicles for delivery runs. Therefore, the Court determines that this factor weighs in favor of finding an employment relationship.

### C. Opportunity for Loss or Profit

Plaintiffs argue that QDS determines the drivers' opportunity for loss or profit. Baker sets the pay rates for all route deliveries according to whatever profit he hopes to realize for the company. Baker also establishes the terms and hourly rates for an "overtime system."[9] Furthermore, QDS' account managers decide which routes will be given to what drivers, which is significant given that each route has a different pay rate. (Walker Depo. at 21-22.)

Defendants counter that it is the drivers themselves who are most responsible for whether they realize a loss or profit, because it is the drivers who determine how much they will work and how efficiently they will complete their work. However, Defendants fail to show the ways in which a driver may make his or her route more or less profitable through efficiency, and provide little evidence suggesting any drivers have actually been able to reduce their costs, and, in turn, increase their profits, by such efficiency.

---

[9] This "overtime system" is an established pay rate for time spent waiting at a delivery stop. If drivers are forced to wait at a delivery stop for more than fifteen minutes, they are compensated according to an hourly rate for all time spent waiting thereafter. (Baker Depo. at 120-121.)

The most determinative factors of a driver's profit or loss are route pay rate and route assignment, both of which are under QDS' control and not the control of the drivers. *See Molina*, 420 F. Supp. 2d at 1286 n. 28 (stating that when a business controls the primary factors governing its workers' earnings, employee status is suggested). Any money drivers could theoretically save by using a more fuel-efficient car, for instance, must be considered *de minimus* to these factors. *See id.* at 1286 (stating that any cost reduction associated with a theoretic ability to use a more fuel-efficient car "would likely be *de minimus* in relation to the overall 'cost' of providing the [delivery] service"). Additionally, the Court is not persuaded by the fact that drivers could ask for more work or attempt to negotiate better pay rates. "[T]he fact that an individual could request more work or re-negotiate his or her compensation is not indicative of independent contractor status, because any employee can do those things as well." *Id.* (citing *Halferty*, 821 F.2d at 266). The Court concludes that because QDS controlled the factors primarily responsible for determining its drivers' earnings, this factor weighs in favor of finding an employment relationship.

   **D.**  **Skill and Initiative Required in Performance of the Job**

"A lack of specialization indicates that an individual is an employee, not an independent contractor." *Id.* (citing *Halferty*, 821 F.2d at 267; *Gustafson v. Bell Atlantic Corp.*, 171 F. Supp. 2d 311, 324 (S.D.N.Y. 2001)). There is little to be said about the skill and initiative required in order for the drivers to perform their jobs. The evidence before the Court is ripe with testimony characterizing the delivery job as simple, straight-forward, and requiring little skill aside from the ability to drive a car from point A to point B. Although some training was apparently given to new drivers, this training consisted of little more than ensuring the drivers were familiar with

their routes, could complete basic paperwork, and understood how to scan prescriptions with the iPAQ devices. This training generally lasted only a few hours. As for initiative, QDS account managers had the final say as to which routes were assigned to which drivers, and provided drivers with their daily route sheets that could not be varied from without pre-approval. As such, it cannot be said that the drivers were able to assert much initiative in their jobs.

The Court finds that little skill or initiative was required to complete the job expected of drivers, which suggests an employment relationship. *See id.* at 1286–87 (finding that delivery services generally involve little skill or initiative).

### E. Permanency of the Relationship

As for the permanency of the relationship between QDS and its drivers, Plaintiffs point to the fact that most drivers who have joined in this lawsuit were employed by QDS for substantial amounts of time: "Sakacsi worked for QDS for approximately 40 months, Diana Maxwell work [sic] for approximately 26, Joseph Ennis has worked for approximately 22 months, Krista Margie has worked for approximately 22 months, Cheston Cloudus has worked for approximately 22 months, Gary Butt has worked for approximately 21 months, and Beth Michael worked for approximately 15 months." (Doc. No. 54 at 22–23.) Plaintiffs also contend that the permanency of the relationship is evidenced by the disciplinary system used by QDS. Although the drivers may be terminated at-will, it is not QDS' practice to do so. In practice, QDS generally subjects its drivers to a progressive disciplinary system, administered by account managers, with Baker holding the ultimate decision-making authority. (*see e.g.* Culver Depo. at 24-33.)

Defendants state that most of its driver workforce falls into two categories: (1) drivers who work for a short period of time and quit because they do not like the job; and (2) drivers who remain with QDS for a long period of time. Defendants argue that this fact shows that the permanency of the relationship factor is indeterminative as to whether an employment relationship existed. However, the Court notes that Defendants fail to demonstrate how these two categories apply to the Plaintiffs in this case.

The Court is not entirely persuaded by Plaintiff's arguments. Plaintiffs provide the specific number of months worked for only seven of the at least thirty delivery drivers who opted into this lawsuit. The use of a progressive disciplinary system does tend to suggest a more permanent relationship between the parties, but the suggestion is not so strong as to convince the Court that this factor weighs in favor of finding an employment relationship. The Court finds that the permanency inquiry does not provide much insight as to whether QDS drivers were employees or independent contractors.

### F.     Degree to which Plaintiffs' Tasks were Integral

Defendants do not attempt to contest that the drivers' task is integral to QDS' business. Simply put, without its delivery drivers, QDS could not function. *See Molina*, 420 F. Supp. 2d at 1287 (finding that it could not be reasonably disputed that a courier service could not operate without its couriers); *Ansoumana v. Gristede's Operating Corp.*, 255 F. Supp. 2d 184, 191–192 (S.D.N.Y. 2003) (holding that where a company's primary business was delivery services, the drivers who performed those deliveries were an integral part of the business). The Court finds that the drivers were an integral part of QDS' business, and that this factor weighs in favor of finding an employment relationship.

**IV.     Conclusion**

Five of the six factors weigh in favor of deeming the Plaintiffs to be employees rather than independent contractors, and the only factor that does not weigh in favor of finding an employment relationship—permanency of the relationship—does not shed much light on the Plaintiffs' economic dependence on QDS.  The Court finds that there are no genuine issues of material fact to be decided at trial over whether Plaintiffs were independent contractors or employees.  Based on the facts, no reasonable jury could conclude that Plaintiffs were independent contractors rather than employees.

Accordingly, it is **ORDERED AND ADJUDGED** that Plaintiffs' Motion for Partial Summary Judgment (Doc. No. 54) is **GRANTED**.  Summary judgment is granted for Plaintiffs as to QDS' second affirmative defense that Plaintiffs were independent contractors and not employees.

**DONE AND ORDERED** at Tampa, Florida, this 28th day of November, 2007.

SUSAN C. BUCKLEW
United States District Judge

Copies to:
Counsel of Record